### SWINK v. CITY OF DALLAS et al.
### No. 1203—5557.

Commission of Appeals of Texas, Section B.
March 4, 1931.

Clint & Eades, of Dallas, for plaintiff in error.

J. J. Collins, City Atty., and H. P. Kucera, A. A. Long, and W. Hughes Knight, Asst. City Attys., all of Dallas, for defendants in error.

SHORT, P. J.

The plaintiff in error, Rebecca Z. Swink, on the 4th day of December, 1924, filed this suit in the Fourty-Fourth judicial district court of Dallas county against the city of Dallas, the county of Dallas, the board of education of the city of Dallas, and E. W. Morten, to recover an acre of land, part of the site of what is known as the Cedar Lawn school, located, since the year 1888, within the limits of the independent school district in charge of and operated by the city of Dallas, through the proper officials. Upon a trial of the case to a jury the court instructed a verdict against the plaintiff in error, and, upon appeal to the Court of Civil Appeals at Dallas, that judgment was affirmed on the ground that, as a matter of law, the plaintiff in error's cause of action was barred under the four years' statute of limitation at the time the suit was filed. 19 S.W.(2d) 601. Upon a consideration of the application for the writ of error, the Supreme Court granted it, making this notation: "We are inclined to think the evidence raised the issue of limitation."

The matters of law presented in the application for the writ of error do not present any question of pleading, though there were many special exceptions urged to the petition by the city of Dallas, and what we shall say in this opinion is upon the assumption that the plaintiff in error stated a cause of action in her petition, which is quite lengthy. One of the purposes of the petition was to set aside a certain warranty deed executed by the plaintiff in error to the city of Dallas on September 26, 1918, more than six years before the suit was filed. So long as this deed remains uncanceled, the city of Dallas was the apparent owner of the property involved, since the deed evidenced an unqualified conveyance of the property by the plaintiff in error to the city of Dallas for the consideration of $1,000, shown to have been actually paid. If the conclusion reached by the Court of Civil Appeals, in its opinion, is correct, which is to the effect that the statute of limitation of four years (Rev. St. 1925, art. 5529) began to run against the grantor, and in favor of the grantee, immediately upon the execution and delivery of the conveyance, then all other questions involved in the case are necessarily eliminated. We will discuss this question first.

On October 28, 1879, G. M. Swink, the husband of the plaintiff in error, conveyed to R. E. Burk, county judge of Dallas county, Tex., and his successors in office, a one-acre tract of land to be used for school purposes, in which there is incorporated the following provision: "In the event that the above described land should cease to be used for school purposes then this conveyance to be void and the land, with the improvements thereon, to revert back to the said G. M. Swink."

On October 15, 1879, John J. Eakins and wife conveyed to the same grantee an acre of land adjoining the tract conveyed by Swink. This conveyance was also for school purposes and contained a reversion-

ary clause. These two tracts constituted and were afterwards used as what was afterwards known as the Cedar Lawn school property, by the county, for public school purposes for several years. In the month of April, 1888, certain territory, including the Cedar Lawn school property, was annexed to the city of Dallas by ordinance, but the county of Dallas did not execute to the city of Dallas any conveyance of its rights, acquired by virtue of the previous deeds made by G. M. Swink and by John J. Eakins and wife. After the annexation of the territory to the city of Dallas this property was used by the city for general public school purposes until the close of the school term, immediately before the institution of this suit. A few weeks before the institution of this suit there appeared in a newspaper, published at Dallas, a statement that the Cedar Lawn school property had been sold to E. W. Morten for $50,000, and that the pupils had been transferred to other schools. The petition of the plaintiff in error, among other things, alleged an abandonment of the property, under discussion, for school purposes and a reversion to her of the title, under the provisions of the deed executed by G. M. Swink, who had died in 1905, leaving a will in which the plaintiff in error was named as sole beneficiary and made independent executrix. The plaintiff in error also alleged, among other things, that the execution and delivery of the deed, dated September 26, 1918, by her to the city of Dallas, for the consideration of $1,000, had been procured from her by the city of Dallas while she was mentally incapable of understanding the transaction involved, and by means of false representations and for a grossly inadequate consideration. The petition alleged that the plaintiff in error was, at the time, more than eighty years of age, feeble in mind and body, wholly without business experience of any kind, ignorant of the value of the property in question, and of her rights therein, or the title thereto, and that she did not learn the facts in the case, showing the falsity of the representations, and the character of her rights in the property, until a short time before the institution of the suit. Among other things the city of Dallas, in its answer, interposed, as a defense, the bar of the statute of limitation of four years, more than that length of time having elapsed from the execution of the deed sought to be canceled, and the filing of this suit. The Court of Civil Appeals held that the trial court was correct, under the testimony, in instructing the jury to find a verdict against the plaintiff in error, doubtless upon the theory that it was the duty of the plaintiff in error, under all the facts and circumstances, to have instituted the suit within the four-year period, and, in order to intelligently discuss this question, it is essential that we consider the testimony introduced by the plaintiff in error in its most favorable light, and then to determine whether this testimony, thus construed, is sufficient to present an issue of fact, which the plaintiff in error had the right to have ascertained by the jury, under proper instructions.

The law presumes every party to a legal contract to have had sufficient mental capacity to understand his legal rights with reference to the transaction involved, and, to overcome this legal presumption, the burden of proof rests upon the party asserting to the contrary to establish it, by a preponderance of the evidence, and, if there shall not be sufficient legal evidence introduced to present an issue of fact on this subject, there is no duty resting upon the trial court to submit an issue to the jury for its finding. However, where there has been sufficient testimony introduced on this subject to present an issue of fact, in favor of the plaintiff, and the defendant interposes to this cause of action a plea that the cause of action is barred by the statute of limitation of four years, the burden of proof rests upon him to establish this defense by a preponderance of the evidence on this subject. The allegations of the petition, among other things, are to the effect that the city of Dallas, by its authorized agents, induced the plaintiff in error to execute the deed by making material false representations, and that at the time the deed was executed by her the plaintiff in error was mentally incapable of understanding what she was doing and the legal consequences of her acts, and, further, that this mental incapacity of the plaintiff in error continued until the suit was brought. Assuming the truth thereof, these allegations presented a legal cause of action, in existence at the time the suit was filed, for the reason that, under the allegations, the statute of limitations did not begin to run until the plaintiff in error had been sufficiently mentally restored to be charged with the duty of discovering the apparent true import of her deed of conveyance, as well as of discovering the falsity of the material representations made to her at the time she executed the deed. Limitation against a suit to secure relief from a deed procured by fraud begins to run when the fraud becomes known, and knowledge of the fact which would induce, by a prudent person, inquiry which would lead to the discovery of fraud is in law a knowledge of the fraud. But according to the allegations of the plaintiff in error's petition, until a brief period of a few weeks had elapsed previous to the filing of the suit, she did not have the mental capacity of a prudent person when there devolved upon her the duty to make inquiry, which would have led to the discovery of the fraud. So the real question involved is

whether these allegations made in the plaintiff in error's petition are supported by any substantial testimony viewed in its most favorable light. If the plaintiff in error, in the opinion of the jury, supported by testimony, did not occupy the position of an ordinarily prudent person from the time the deed was executed, until immediately before the suit was filed, and should further find that the deed was procured by fraud of a material nature, supported by sufficient testimony, these two facts would be sufficient to entitle the plaintiff in error to a cancellation of the deed, and as we have seen, if the deed should be canceled, the defendant in error the city of Dallas would be deprived of a link of its chain of title to the land involved, upon the theory that the deed sought to be canceled was necessary to support its claim of title.

The record discloses that, at the time the plaintiff in error executed the deed, which is sought to be cancelled, and for several years previous thereto, as well as several years thereafter, the plaintiff in error was living in a state of extreme seclusion, taking no part in any domestic or business affairs, mentally incapable of appreciating the import of current events, being under the necessity of receiving constant attention, in order to supply her necessary wants, associating with no one except the members of her immediate family, and being content to let the world and its business go by unnoticed, when the duly authorized agents of the city of Dallas began to make visits to her, with the evident purpose of securing the execution and delivery of the deed, which they finally accomplished, telling her that she had no interest in the property in fact, but that they were willing to give her a little something for the instrument they wanted her to sign. This instrument, when finally executed and delivered, turned out to be a regular conveyance of the land, with general warranties of title, which instrument was evidently prepared by the agents of the city of Dallas and was acknowleged before the assistant attorney representing the city. In other words, the whole transaction furnishes evidence of the asserted fact that it was the creature of a carefully considered enterprise originating with trained selected officials of this corporation from beginning to end, and that what the plaintiff in error had to do with it was not the result of any independent act on her part, but that what she did was the result of suggestions made by these agents, or, if not entirely by these agents, then by suggestions made by some members of her family, none of whom had any interest in the property involved. We think these allegations are sufficiently supported by the testimony to have justified a jury in finding the facts to be as claimed by the plaintiff in error.

The testimony introduced by the plaintiff in error, in support of her material allegations, is quite lengthy, and we only embrace in this opinion a few extracts therefrom to indicate the general nature of it. The son-in-law, J. T. Buckenham, in whose home the plaintiff had lived since the death of her husband, testified in part as follows: "There has been no time since the death of G. M. Swink that Mrs. Swink has not lived with me. * * * My wife and I have been taking care of her, doing the best we could. During the year 1918 she was very weak and had to have a doctor very frequently; her mind was very weak and at times she was prostrated. * * * Since I have known Mrs. Swink, from the beginning, she has never been a business woman; she has never had any business to transact. * * * During the last fifteen years her memory has been very bad. * * * She cannot remember the day's transaction; she will get up and ask us why we are not going to Sunday School and we will tell her this is not Sunday, and in a few minutes she will ask the same question over. * * * He, Mr. Ethridge, (the City's agent who procured the deed) came to me and asked me if I thought it was all right if she would do this. * * * She did not know any better, she would have done it for nothing if he had asked it in the right way, she did not know what she was doing. * * * I had nothing first or last to do with that transaction (speaking of the execution of the deed by the plaintiff in error).

"Another married daughter, with whom the plaintiff in error did not live, Mrs. Irene Swink Henry, who seemed to have written the note signed by her mother, addressed to the city authorities, stating that she would execute a deed to the property for $1,000, among other things, testified: "My mother and I were living on Hickory Street when this note was written and Mrs. Buckenham was not at her home. * * * I never heard up to 1924 about the City having ceased to use that property for school purposes. * * * I read something in the Dallas News about this Cedar Lawn school and the pupils leaving it. * * * It was after we read about the sale in the papers when this suit was brought. * * *"

The daughter, with whom Mrs. Swink lived, Mrs. J. T. Buckenham, among other things testified: "My mother was 90 years old July 13, last year. * * * Since the death of my father my mother has lived in our home. * * * In 1918 she was over 80 years of age. * * * I don't know what produced the bad condition or complaint she was suffering from. * * * My mother did not attend to things in the home. * * * While she was living there Mr. Ethridge and Mr. Balonz called at our home to see her in connection with the Cedar Lawn school property. * * * Mr. Ethridge was con-

nected with the City School Board. * * * He stated there was a cloud over the title of the school property. * * * They wanted my mother's signature. * * * They offered her $200.00 for it. * * * My mother did not accept his offer of $200.00. * * * They then just went away and went and talked to my husband about it. * * * Mr. Ethridge did come back to see my mother later and just always said the same thing. * * * They came there and visited my mother, just she and I were present, and they made this offer and told us about this school property they were trying to clear up the title to all property and this one had a slight cloud or flaw, as he expressed it, over it, just a cloud over the title and that could be easily remedied if my mother would give her signature to it. * * * On the second visit by Mr. Ethridge, in connection with the whole matter, they just came like they did the first time, and found out we did not take the proposition they offered first, then offered a little bit more, $300.00 and then $500.00 and then that was just about all; they just left it up to her to decide whether she would take that or not and she did not take it. * * * Then there was not anything said about it for a long, long time, several months, and then she was offered $1,000.00 for it and she accepted that offer and received the money. * * * Very often, in my mother's condition, she could not be left alone and my sister would come and spend the day and that would be my day away from home. * * * We never could leave her alone. * * * At that time she was in feeble health physically. Right now she is better able to be up more than she was then. * * * At that time she was confined to her room and most always to her bed. * * * She gets around better now than she did at that time."

After stating that her mental condition rendered her incapable of transacting business at the time the deed was executed, this witness continued: "At the time she was ill her mind was in this state; she would say there was somebody at the foot of her bed, or something like that, and she would hear dogs or something outside and be disturbed over that; so nervous that we would have to call a physician to give her something to quiet her."

Again, speaking of the transaction involved in her signature to the deed, this witness said: "Whether she signed it did not make much difference, only they would like to have it. * * * It was school property. * * * It was given for that. * * * They talked to her about it and about how my father had given it, told her they would like to have her to do it, and offered to pay her for her signature, the way I understand it."

The testimony of the plaintiff herself, who was introduced as a witness, in a general way, corroborated the testimony we have quoted, as to her mental condition, though, of course, several years had elapsed from the date the deed was executed until this testimony was given.

The testimony introduced in the case also further shows that the school authorities discussed the condition of the title to this property at great length and on various occasions, and, with one exception, it was the general opinion that, in order for the city to acquire a good title to it, it was necessary to get an absolute conveyance, such as they did get from the plaintiff in error, from those holding the reversionary interest to the two acres, these persons being the plaintiff in error, and the owners of the reversionary interest in the other acre, which had been conveyed by Eakins and wife, under similar conditions, and that, in pursuance of these general discussions, a man by the name of Ethridge was empowered and directed to procure an absolute conveyance from the plaintiff in error. This he did under the circumstances which we have heretofore stated, in a general way. Pomeroy's Equity J. P. 4 Ed. Vol. 2, §§ 947 and 963; Black on Rescission and Cancellation of Instruments, Vol. 1, §§ 248–262–264 and 265; McFaddin v. Vincent, 21 Tex. 47.

While the facts are altogether different, the principles of law involved in McFaddin v. Vincent, supra, applied in that case, are applicable in this. In McFaddin v. Vincent, the charge of the presiding judge, Peter W. Gray, one of the ablest judges that Texas has produced, is set out in full on pages 53 and 54. This charge was expressly approved by another very eminent jurist as judge of the Supreme Court, O. M. Roberts. Under that charge the jury were instructed to find the validity or invalidity of the two contracts involved in the litigation. We commend the charge in McFaddin v. Vincent to the favorable consideration of the district judge upon another trial of the case, in giving to the jury the legal guide by which they should determine the issues involved in this particular matter.

We therefore conclude that the Court of Civil Appeals was in error in affirming the judgment of the trial court on the ground that it did and that the trial judge should have submitted the issues presented by the testimony, with reference to the cancellation of the deed of September 26, 1918, and the statute of limitation of four years.

In view of another trial of the case, we think it proper to say that what the agent of the city of Dallas may have said to the plaintiff in error, as to the future intentions of the city of Dallas to continue to use the

property for school purposes, could not be material to any issue in the case. The city of Dallas would not be bound by any such declarations of the agent made in 1918, in determining what action it would take at a future time. Moreover, the future promise, or the declaration of future intentions, can never be made the basis for relief against fraud, unless it be further shown that the party making the promises, or stating the intentions, was authorized to do so, and, furthermore, that he had no intention at the time the promises or statements were made to do as he promised or stated he would, or intended to do. However, the testimony shows that the property was worth in the neighborhood of $25,000, and that the plaintiff in error only received $1,000, and, while mere inadequacy of price is not a legal ground for setting aside a sale of property, yet, where there has been a great inadequacy of price shown, the courts have been willing to set aside a deed where there has also been shown slight evidence of fraudulent acts. In other words, the courts have indicated a disposition to give relief to a party against whom fraud has been perpetrated, where the party defrauded has been deprived of substantial rights, the benefit of which has been received by the party guilty of the fraud. In this case it is likely, if the plaintiff in error had been left alone in her seclusion, this deed would never have been executed for the reason that the plaintiff in error would never have had mental ability or individual inclination to have sought out the agents of the city of Dallas, and to have procured from it this $1,000, in consideration of the execution and delivery of the deed, which in fact was executed and delivered.

The defendant in error also interposed the defense of limitation under the five and ten year statute (Rev. St. 1925, arts. 5509, 5510). The testimony shows, without dispute, that the Cedar Lawn school property was carried on the official plat of the city of Dallas as property belonging to the city "for school purposes only." The testimony further shows that this property was used, for such purposes only, by the city during all the time it was in possession of it. The testimony further shows that it came into possession of this property by virtue of an ordinance, annexing, for school purposes, territory in which the property was located. There is no testimony in the case even tending to show that the city of Dallas ever asserted absolute ownership of the property, but, on the contrary, it is affirmatively shown that the city of Dallas took possession of this property, under and by virtue of the deed executed and delivered by G. M. Swink to the county judge of Dallas county and his successors in office, and no notice was ever given to G. M. Swink, or any one representing him, that the city had repudiated its action in accepting the property under this deed, and, until notice of such repudiation is shown to have been given, the statute of limitation would not begin to run. So we conclude that the only issue of fact, relating to the question of limitation, presented by the testimony, must be determined under the statute of limitation of four years.

There is a contention made by the city of Dallas that, since G. M. Swink is dead and the reversionary clause in the deed does not, in so many words, embrace his heirs or assigns, this reversionary interest died with G. M. Swink. This instrument, executed by G. M. Swink, clearly indicates his intention to give to the county judge of Dallas county, and his successors in office, for school purposes only, this property, and that this gift should continue in existence only, and during the time that the property should be used for school purposes. The language used is not in the nature of a condition subsequent, but is a limitation upon the title actually intended to be conveyed. The property was given by Swink and was received by the county of Dallas for a specific purpose, the statement being explicit that the deed should be void in the event that the property should cease to be used for school purposes. The county of Dallas accepted the property, and it and its successors are under the obligation to continue to use it for school purposes so long as it shall assert any right thereto. It would be an act of bad faith to abandon the property for school purposes and attempt to retain possession of it, according to the evident intention of the parties, as expressed in the deed of G. M. Swink to the county of Dallas. That intention is further evidenced by the fact that the county of Dallas immediately commenced to use the property for school purposes, and that it and its successors in office continuously used it for a period of forty years, without any change, and that such change, which has been made in the use of the property, does not unqualifiedly show that the property is not now being used for school purposes. The deed does not define the kind of school that must be maintained on the property. It merely says that the property must be used for school purposes.

Upon another trial of the case the testimony on the subject of actual abandonment may be different, but until there is testimony, which will justify the jury in concluding that the city of Dallas has actually abandoned the property for school purposes, the trial court would not be authorized to submit any issue on that subject. Stewart v. Blain (Tex. Civ. App.) 159 S. W. 928; Campbell v. City of Kansas, 102 Mo. 326, 13 S. W. 897, 10 L. R. A. 593. Had the city of Dallas consummated its intention to sell the property to E. W. Morten, by the execution and delivery of a deed to him, coupled with the acceptance of said deed, there would be no question of fact to be submitted to the jury on this subject.

On the contrary, if the record should disclose that the city of Dallas had withdrawn said property from its use for school purposes of any character, but had continued to retain possession of it, under circumstances tending to show that it had not finally abandoned the property for school purposes, there might be a question of fact for the jury to determine on this subject, but, as we view the record, the city of Dallas is still using the property for school purposes, though its use for school purposes has been somewhat curtailed. So long as the city of Dallas sees fit to use the property for school purposes, in good faith and in its own way, we do not think the question of abandonment is presented. Evidently this suit would not have been instituted, to recover the possession of the property, had the city of Dallas not attempted to sell it to E. W. Morten, clearly indicating that the plaintiff in error had, in so far as she had the ability to comprehend what her husband had done, construed the deed of her husband to mean that she was not entitled to the possession of the property so long as it was used for school purposes. Equally clear is the construction placed upon the deed of G. M. Swink, by the city of Dallas, that the latter was entitled to the use of this property only so long as it was used for school purposes. All the parties to the transaction having placed this construction upon the deed of G. M. Swink, it is the duty of the courts to give the same meaning to it, which all the parties have given to it.

We therefore recommend that the judgments of the Court of Civil Appeals and of the trial court be reversed and the cause remanded.

CURETON, C. J.

Judgments of the district court and Court of Civil Appeals are both reversed, and cause remanded, as recommended by the Commission of Appeals.

We approve the holdings of the Commission of Appeals on the questions discussed in its opinion.